******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SHARON DENUNZIO *v.* PETER DENUNZIO ET AL.
(SC 19388)

Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued September 11, 2015—officially released January 12, 2016*

*Michael P. Kaelin*, with whom was *William N. Wright*, for the appellant (plaintiff).

*Samuel V. Schoonmaker IV*, with whom, on the brief, was *Wendy Dunne DiChristina*, for the appellee (named defendant).

*Louise T. Truax*, with whom, on the brief, was *Leslie I. Jennings-Lax*, for the appellee (defendant Douglas DeNunzio).

*Opinion*

McDONALD, J. In 2007, the legislature adopted a paradigmatic shift in its approach to conservatorship appointments, including significant modifications to the circumstances and manner in which they may be made. This certified appeal requires us to consider how the substantive and procedural amendments to the conservatorship scheme set forth in No. 07-116 of the 2007 Public Acts (P.A. 07-116) affected the Probate Court's selection of a conservator in this case.

The plaintiff, Sharon DeNunzio, appeals from the judgment of the Appellate Court affirming the trial court's judgment which, in turn, affirmed the Probate Court's decision to appoint the defendant, the plaintiff's former husband, Peter DeNunzio, conservator of their adult son, Douglas DeNunzio.[1] On appeal, the plaintiff claims that the Appellate Court improperly concluded that her substantial rights were not prejudiced because: (1) the Probate Court properly could use Douglas' "best interests" as a consideration in the appointment of a conservator, in addition to the statutory factors adopted in P.A. 07-116; see General Statutes § 45a-650 (h);[2] or as a guiding principle in applying those factors; and (2) a guardian ad litem's report supporting the defendant's appointment was properly considered by the Probate Court for its opinion as to the ultimate issue of fact and was not considered insofar as it contained inadmissible hearsay. We agree with the plaintiff that, after the enactment of P.A. 07-116, probate courts may no longer consider the amorphous "best interests" of a respondent in conservatorship proceedings. We further agree that probate courts may only consider evidence that has been properly admitted pursuant to the rules of evidence. We nevertheless conclude that, to the extent that the Probate Court may have engaged in such improper considerations, the plaintiff's substantial rights were not prejudiced in light of the clear weight of the admissible evidence supporting the defendant's appointment under the proper standard. We therefore affirm the judgment of the Appellate Court.

The record reveals the following undisputed facts and procedural history. For many years, Douglas has manifested symptoms of mental distress, including paranoia, extreme anxiety, and a tendency to perseverate, meaning to obsess over a particular topic, most notably, his health. The plaintiff and the defendant, whose marriage was dissolved in 2003 when Douglas was still a minor, have been involved in a protracted dispute over whether Douglas' symptoms were caused by chronic Lyme disease and/or psychological and/or developmental disorders. During the early stages of this dispute, the trial court in the dissolution action modified its custody orders to confer on the defendant sole decision-making authority over medical decisions concerning Douglas. The trial court in the dissolution action

subsequently held the plaintiff in contempt of that order after she took Douglas to a pediatrician without the defendant's consent, finding that the plaintiff's "preoccupation with Douglas' health" was unhealthy for Douglas.

Douglas' numerous treating physicians have determined that his symptoms were caused by schizophrenia and an Asperger spectrum disorder. The defendant accepted these physicians' opinions and agreed with their advice to place Douglas on a regimen of antipsychotic medications, which appeared to them to stabilize Douglas' condition. With the plaintiff's consent, the defendant placed Douglas in a residential education and treatment facility (school) that holds itself out as specializing in the treatment of young males with developmental, psychological and learning disorders. The school's staff has concluded that Douglas was making good progress under this course of treatment.

Although the plaintiff agrees that Douglas is on the autism spectrum, she disagrees with the defendant with respect to the cause of that condition and Douglas' symptoms of mental distress. Specifically, the plaintiff is convinced that these conditions have resulted from chronic Lyme disease that had persisted despite repeated courses of antibiotic treatment, negative test results, and Douglas' ability to engage in vigorous athletic activities such as skiing. She therefore advocated substantially reducing Douglas' antipsychotic medication and treating him with antibiotics.

In 2011, shortly after Douglas' twenty-first birthday, the defendant filed an application in the Probate Court seeking to be appointed as Douglas' conservator. The plaintiff filed an objection to that application, and filed an application seeking her own appointment. The Probate Court thereafter appointed an attorney and a guardian ad litem for Douglas, Louise T. Truax and Richard J. Margenot, respectively.

Because Douglas' representatives and parents all stipulated that Douglas' condition was such that he needed a conservator, the evidentiary hearing on the applications focused principally on the question of who the conservator should be. Truax informed the court that Douglas had refused to express a preference regarding which one of his parents should be appointed. Both the plaintiff and the defendant testified at length regarding Douglas' medical and educational history, and voiced their respective views about the underlying cause of his symptoms. The defendant also testified that he had taken Douglas to hundreds of medical appointments over the years, that he had discussed Douglas' wishes regarding his medical treatment with Douglas as recently as the previous week, and that he was willing to commit his time and financial resources to ensure that Douglas received appropriate medical care. The plaintiff testified that Douglas wanted to be taken off

of his current medication and treated for Lyme disease, that she would replace Douglas' medical team if appointed, and that she believed that the defendant was not committed to following Douglas' interests or promoting his independence.

In support of his application, the defendant offered testimony from Douglas' current treatment providers. These providers contrasted their observations of the defendant's commitment to a course of treatment that had helped Douglas and Douglas' calm state when under the defendant's care with their contrary observations of the plaintiff. Nancy O'Hara, a physician who specializes in autism and neurological development issues and who had treated Douglas for many years, testified that, although Douglas previously had Lyme disease, it had been effectively treated. O'Hara testified that the plaintiff repeatedly had violated instructions not to discuss medical treatment with Douglas because it caused him severe anxiety. O'Hara also testified that she did not believe the plaintiff would adhere to her advice that Douglas should continue his antipsychotic medications. O'Hara further testified, over the plaintiff's objection, that it was her opinion that the defendant, who had adhered to O'Hara's instructions, should be appointed Douglas' conservator. O'Hara's concerns about the plaintiff's conduct as it adversely effected Douglas' state of mind was echoed in testimony from Shahrzad Yamini, a psychiatrist at Douglas' school, and Joanne Boelke, a clinical therapist and social worker at the school.

In support of the plaintiff's application, the court heard testimony from two psychiatrists who had examined Douglas eighteen months and three years prior to the hearing, respectively. In addition to their observations based on those examinations, these experts offered opinions based on information that had been provided to them by the plaintiff. Carl Mueller testified that Douglas had an abnormality on the surface of his brain that could have been caused by chronic Lyme disease, and suggested the possibility that Douglas may be on too high a dosage of antipsychotic medication, but conceded that Douglas should continue the medication as prescribed if the defendant accurately had represented Douglas' condition. Robert Bransfield opined that Lyme disease may be a contributory factor to Douglas' symptoms and therefore recommended that a Lyme disease specialist be added to Douglas' treatment team and that the team consider adding antibiotics to Douglas' current medications.

On the last day of the evidentiary hearings, Margenot filed a guardian ad litem report over the plaintiff's objection. The report indicated that Margenot had interviewed various medical and educational professionals, Douglas' family members, and Douglas himself, and had reviewed various documents, including deposition testimony. The report stated that, based on this informa-

tion and the evidence adduced during the preceding evidentiary hearings, Margenot's opinion was that it was "in [Douglas'] best interests to appoint [the defendant] as [Douglas'] [c]onservator of the [p]erson and [e]state . . . ." The plaintiff claimed that the report was inadmissible because it contained hearsay and an opinion on the ultimate issue in the case. The Probate Court indicated that it believed that it was proper for a guardian ad litem to offer such an opinion, but withheld a definitive ruling on the admissibility of the report pending a review of the rules of evidence. Although Margenot did take the stand so that the plaintiff could question him regarding the report, it was never admitted into evidence.

The Probate Court subsequently issued a decision finding by clear and convincing evidence that Douglas needed a conservator of both the person and estate and appointed the defendant as conservator. The Probate Court's decision cited testimony related to Douglas' psychological and developmental conditions and symptoms, the harmful effect that his parents' conflict had on him, and concerns about the plaintiff's interference with Douglas' current course of medical treatment. The decision noted the filing of Margenot's report and the conclusion therein that the defendant should be appointed conservator. The Probate Court concluded its decision by stating: "This court further finds that there is no doubt that both parents care and love their son deeply; that they cannot agree on the proper treatment for [Douglas] as they disagree with each other on [Douglas'] current diagnosis; that the [plaintiff's] constant second-guessing of the professionals in charge of [Douglas'] care, causes inconsistent care, duress, anxiety and perseveration to [Douglas]; *and that medical professionals involved with [Douglas'] current care and supervision have testified that it is in the best interest of [Douglas] to have the [defendant] appointed as conservator.* This court therefore appoints [the defendant] as the conservator of the person and estate of [Douglas] to serve without bond." (Emphasis added.) The decision then set forth the conservator's powers, followed by two statements simply noting, without elaboration, that the court had considered the factors set forth in § 45a-650 (h) in deciding whom to appoint as conservator.

The plaintiff appealed from the Probate Court's decision to the trial court pursuant to General Statutes § 45a-186. The plaintiff claimed, inter alia, that the Probate Court had failed to apply the statutory factors for selecting a conservator set forth in § 45a-650 (h) and had improperly considered Margenot's report. The trial court rejected these claims and affirmed the Probate Court's decision. The trial court ultimately concluded that there was competent and compelling evidence that the appointment of the defendant rather than the plaintiff was in Douglas' best interests and that the plaintiff

had not proved that her substantial rights were prejudiced.

The plaintiff appealed to the Appellate Court, reiterating her claim that consideration of Margenot's report was improper. In connection with that claim, the plaintiff also asserted that the Probate Court's decision improperly had been based on a standard that no longer existed following the enactment of P.A. 07-116. Specifically, she contended that instead of applying the factors prescribed in § 45a-650 (h), the court improperly had applied the pre-2007 best interests of the conserved person standard.

The Appellate Court affirmed the trial court's judgment, concluding that the Probate Court's decision had been rendered in conformity with the conservatorship scheme as modified by P.A. 07-116. *DeNunzio* v. *DeNunzio*, 151 Conn. App. 403, 95 A.3d 557 (2014). With respect to Margenot's report, the Appellate Court determined that, although the rules of evidence applied and Margenot's report had not been admitted into evidence, the Probate Court had considered the report. Id., 412. Nonetheless, it concluded that Margenot could give his opinion on the ultimate issue of fact—who should be appointed as conservator—because having been appointed specifically to investigate the circumstances of the parties, the specialized knowledge he had gained pursuant to his investigation qualified him to make recommendations to the court as to what appointment would be in Douglas' best interests.[3] Id. The Appellate Court further concluded that Margenot properly could rely on hearsay statements in reaching his opinion, and that there was no indication in the record that the Probate Court had relied on any hearsay in the report for substantive purposes in deciding to appoint the defendant. Id., 414.

In connection with its conclusion that the Probate Court could use the specialized knowledge acquired by Margenot to assist it with its determination as to what appointment would be in Douglas' best interests, the Appellate Court stated: "To the extent that the plaintiff suggests that the court is confined to the factors set forth in § 45a-650 (h) in determining whom to appoint as conservator, and the best interests of the conservatee are not a consideration, we disagree. The statutory factors cannot be considered in a vacuum. Consistent with the overall policy and purpose of a conservatorship, the best interests of a conservatee must always be a consideration and a guide in examining the statutory factors. In other words, because a conservator is appointed to serve the best interests of the conservatee, the statutory factors enumerated in § 45a-650 (h) must be considered with the overarching purpose of serving those interests." Id., 409 n.3.

We subsequently granted the plaintiff's petition for certification to appeal, limited to the following issues:

(1) "Did the Appellate Court properly conclude that the [Probate Court properly could use] the 'best interest[s] of the conservatee' standard as [a consideration and a guide in examining the statutory factors]?"; and (2) "Did the Appellate Court properly determine that . . . the plaintiff's substanti[al] rights were not prejudiced by the Probate Court's consideration of . . . Margenot's report, which was not admitted into evidence?"[4] *DeNunzio* v. *DeNunzio*, 314 Conn. 926, 101 A.3d 271 (2014). We conclude that the statutory factors adopted by the legislature in § 16 of P.A. 07-116 and codified as § 45a-650 (h) wholly supplant any "best interests" consideration, but, to the extent that the Probate Court considered that matter, the record demonstrates that the statutory factors were considered and supported the Probate Court's selection of the defendant as conservator. We further conclude that, although there appears to be clear tension between a guardian ad litem's report being considered for substantive purposes without being admitted into evidence and the strict procedural changes mandated under P.A. 07-116, we are not persuaded that any improper reliance on Margenot's report would have affected the outcome. Accordingly, the plaintiff's substantial rights were not prejudiced.

Before turning to the merits of the plaintiff's claim, it is useful to set forth a brief overview of the relevant 2007 amendments to the conservatorship process, and the legal context in which those changes were adopted. See P.A. 07-116. Prior to 2007, this court generally adhered to the principle that "the legal disability of an incompetent is analogous to that of a minor." *Cottrell* v. *Connecticut Bank & Trust Co.*, 175 Conn. 257, 264, 398 A.2d 307 (1978); accord *Lesnewski* v. *Redvers*, 276 Conn. 526, 537, 886 A.2d 1207 (2005), overruled by *Gross* v. *Rell*, 304 Conn. 234, 270–71, 40 A.3d 240 (2012).[5] This court thus reasoned that "there is no difference in the court's duty to safeguard the interests of a minor and the interests of a conserved person. . . . This is reflected in the statutory scheme governing conservatorships, which requires the Probate Court to be guided by the conserved person's best interests in establishing the conservatorship and selecting the conservator; General Statutes [Rev. to 2005] § 45a-650 (e); limiting the conservator's powers and duties; General Statutes [Rev. to 2005] § 45a-650 (h); resolving conflicts between conservators; General Statutes [Rev. to 2005] § 45a-657; approving a conservator's petition to sell or mortgage the conserved person's real property; General Statutes [Rev. to 2005] § 45a-164 (a); and determining whether to remove a conservator. General Statutes [Rev. to 2005] §§ 45a-242 (a) and 45a-199 . . . ."[6] (Citations omitted.) *Lesnewski* v. *Redvers*, supra, 540–41.

Public Act 07-116 evidenced a fundamental shift in policy regarding the capacity of conserved persons and their concomitant rights. As our courts previously have

recognized, the legislature made comprehensive substantive and procedural changes to the conservatorship scheme designed to require probate courts to respect individuals' preferences, impose the least restrictive means of intervention, and provide more transparency and accountability in the conservatorship process. See *Kortner* v. *Martise*, 312 Conn. 1, 53–56, 91 A.3d 412 (2014) (discussing legislative history of P.A. 07-116); *Falvey* v. *Zurolo*, 130 Conn. App. 243, 250–53, 22 A.3d 682 (2011) (same). These changes included enumerating factors that must be considered in determining whether a conservator is necessary and, if one is necessary, who should be appointed as conservator. P.A. 07-116, § 16 (codified as § 45a-650 [g] and [h]).

Public Act 07-116, § 16, also required the Probate Court to follow more formal procedures, under which the rules of evidence for civil proceedings apply and testimony is taken under oath. Proceedings relating to the selection of a conservator are required to be conducted on the record; General Statutes § 45a-650 (b); eliminating the usual practice prior to 2007, under which appeals from decisions rendered by the Probate Court were trials de novo. General Statutes (Rev. to 2007) § 45a-186 (a); see P.A. 07-116, § 2 (amending § 45a-186 [a]); *Lesnewski* v. *Redvers*, supra, 276 Conn. 543. Because of the formalities required in such proceedings, they are subject to a new standard of review, under which "[t]he Superior Court shall affirm the decision of the Court of Probate unless the Superior Court finds that substantial rights of the person appealing have been prejudiced because the findings, inferences, conclusions or decisions are: (1) In violation of the federal or state constitution or the general statutes, (2) in excess of the statutory authority of the Court of Probate, (3) made on unlawful procedure, (4) affected by other error of law, (5) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record, or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." General Statutes § 45a-186b; see also *Falvey* v. *Zurolo*, supra, 130 Conn. App. 256–57 (explaining that this standard also applies to appellate courts).

I

With that background in mind, we turn to the plaintiff's claim that the Appellate Court improperly concluded that the Probate Court could consider the "best interests" of the respondent in selecting a conservator, either as an independent consideration or an overarching guiding principle. The plaintiff contends that, because the "best interests" standard was excised from the relevant statute and replaced with five mandatory factors to be considered, it would be inconsistent with the statutory text and the purpose of P.A. 07-116 in limiting the probate courts' discretion to allow the Pro-

bate Court to use the respondent's "best interests" in selecting a conservator. The plaintiff further contends that the decision evidences that the Probate Court made its decision on the basis of which appointment would be in Douglas' best interests by reciting opinion testimony to that effect and by failing to make any findings relating to the statutory factors. In response, the defendant contends that the decision indicates that the Probate Court's decision was predicated on the statutory factors, but even if the court did consider Douglas' best interests, P.A. 07-116 did not intend to preclude such a consideration.[7] The defendant notes that other sections of the conservatorship statutes expressly retain the "best interests" standard. See, e.g., General Statutes §§ 45a-132 (d) and 45a-657. We conclude that the respondent's "best interests" are neither a factor nor an overarching guide in selecting a conservator. We further conclude, however, that to the extent that the Probate Court considered Douglas' best interests, that consideration was not harmful given the Probate Court's consideration of the statutory factors and the clear weight of the admissible evidence supporting its decision under those factors.[8]

A

The question of whether the "best interests" standard is a proper consideration or guide to selecting a conservator is a matter of law, subject to plenary review and our well established principles of statutory construction. See General Statutes § 1-2z (setting forth plain meaning rule); *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 742, 865 A.2d 428 (2005) ("[w]hen a statute is not plain and unambiguous, we also seek interpretive guidance from the legislative history of the statute and the circumstances surrounding its enactment, the legislative policy it was designed to implement, the statute's relationship to existing legislation and common-law principles governing the same general subject matter").

As previously noted, § 16 of P.A. 07-116 amended § 45a-650, which prescribes the procedures a Probate Court must follow in determining whether to appoint a conservator on an application for involuntary representation and, if so, who should be appointed to serve that role. Prior to the passage of P.A. 07-116, the statute provided that "the court shall be guided by the best interests of the respondent" in making both determinations. General Statutes (Rev. to 2007) § 45a-650 (e). Indeed, even when the respondent had requested that a particular person serve as conservator, the Probate Court could disregard that choice if it found that the respondent lacked "sufficient capacity to form an intelligent preference" or if that appointment was "not in the best interests of the respondent." General Statutes (Rev. to 2007) § 45a-650 (e). Public Act 07-116, § 16, deleted the intelligent preference requirement and every reference to "best interests" in § 45a-650. Instead,

it directed the Probate Court to comply with the respondent's choice unless the nominee was unwilling, unable, or disqualified by substantial evidence. P.A. 07-116, § 16. In the absence of an expressed choice, P.A. 07-116 prescribed as follows: "In considering who to appoint . . . the court shall consider (1) the extent to which a proposed conservator has knowledge of the respondent's or conserved person's preferences regarding the care of his or her person or the management of his or her affairs, (2) the ability of the proposed conservator to carry out the duties, responsibilities and powers of a conservator, (3) the cost of the proposed conservatorship to the estate of the respondent or conserved person, (4) the proposed conservator's commitment to promoting the respondent's or conserved person's welfare and independence, and (5) any existing or potential conflicts of interest of the proposed conservator." P.A. 07-116, § 16, codified as § 45a-650 (h).

In light of this background, we can readily dispense with the Appellate Court's determination that the respondent's best interests may be considered as a factor in conjunction with the statutory factors. Under the doctrine of expressio unius est exclusio alterius—the expression of one thing is the exclusion of another— we presume that when the legislature expresses items as part of a group or series, an item that was not included was deliberately excluded. *State* v. *Bell*, 303 Conn. 246, 265, 33 A.3d 167 (2011). Indeed, because the legislature affirmatively deleted every reference to best interests in § 45a-650, we presume that the legislature intended to remove that matter from consideration. This presumption is reinforced by the fact that the legislature undoubtedly knows how to enumerate a nonexclusive list of factors when it wants to. See, e.g., General Statutes § 19a-528 ("the commissioner may consider all factors that the commissioner deems relevant, including, but not limited to, the following"); General Statutes § 51-219b (a) ("the following factors, as well as any other factors which may be relevant, shall be considered"). Using best interests as a factor could thwart the legislature's clear intent because nothing would preclude the Probate Court from giving that factor dispositive weight after considering the statutory factors.

We similarly are not persuaded that the respondent's "best interests" remain an overarching guide through which the statutory factors should be analyzed. That contention is at odds with the text and purposes of P.A. 07-116. The legislature readily could have retained the language directing that the Probate Court "shall be guided by the best interests of the respondent"; General Statutes (Rev. to 2007) § 45a-650 (e); in selecting a conservator and simply elaborated that the statutory factors were relevant to that assessment. Instead, the legislature unambiguously chose to excise the phrase "shall be guided by the best interests of the respondent" from § 45a-650. Indeed, the fact that the legislature

retained the "best interests" standard in a few other sections of the conservatorship scheme demonstrates that it retained that standard where it intended for that standard to apply. It is noteworthy that the provisions in which the "best interests" standard was retained all involve issues that arise after a conservator has been appointed and been provided with those limited powers that cannot be retained by the conservatee. See, e.g., General Statutes § 45a-164 (a) (sale or mortgage of real property); General Statutes § 45a-655 (e) (distribution of gifts from estate); General Statutes § 45a-657 (conflicts between conservators); General Statutes § 45a-679 (conflicts between guardians and conservators). The text of P.A. 07-116 therefore indicates that the legislature retained the "best interests" standard in the specific circumstances in which it was appropriate and abandoned it in those for which it was not.

Although we acknowledge that faithful application of the enumerated factors should yield a result that is in a respondent's best interests, as that term is *commonly* understood, the legislature evidently recognized that the "best interests" standard has historically been imbued with a particular meaning in Probate Court proceedings—one that effectively equates adults who are respondents in conservation proceedings with minors. Public Act 07-116 unambiguously manifests that such a paternalistic view no longer is consistent with a contemporary understanding of the broad range of capacities of persons who are in need of a conservator and the necessity of preserving the rights of such persons to the greatest extent possible. See, e.g., P.A. 07-116, § 1 (allowing respondent or conserved person to refuse court-ordered examination by physician, psychiatrist or psychologist); P.A. 07-116, § 16 (requiring conservators, in carrying out their duties, to employ least restrictive means necessary to meet needs of conserved person and reserving to conserved person all rights and authority not expressly assigned to conservator). Indeed, because there is no statute or rule that expressly directs the Probate Court to make findings on the record in support of the enumerated factors; cf. Practice Book § 6-1 (requiring trial court to state basis for conclusion as to each claim of law and factual basis therefor in rulings that constitute final judgment for purposes of appeal); sanctioning the Probate Court's use of the respondent's best interests as a "guide" in considering those factors runs the risk of the Probate Court effectively continuing to follow past practice. Doing so obviously would be at odds with the goal of P.A. 07-116 to ensure greater accountability in the conservatorship process. We therefore conclude that the "best interests" of the respondent are neither a factor nor a guide in the selection of a conservator.

B

Having concluded that the "best interests" of the

respondent are no longer a proper consideration in making such an appointment, we must determine whether the Probate Court improperly engaged in such a consideration, and, if so, whether the plaintiff's substantial rights were prejudiced by any such impropriety. Although it appears that the Probate Court considered Douglas' best interests, we conclude that this impropriety was not harmful because the record reflects that the Probate Court ultimately, but imperfectly, predicated its decision on the statutory factors.

We note at the outset that the Probate Court's decision is not a model of clarity. The Probate Court unambiguously stated twice in its decision that it had considered the factors set forth in § 45a-650 (h) in selecting the defendant.[9] The decision does not, however, reference any of the specific statutory factors or state factual findings that are directly connected to any one of those factors. In what appears to be a brief summary of the evidence preceding the decision to appoint the defendant, much of the evidence recited is more directly related to why the plaintiff is not qualified or the better qualified person to be the conservator rather than why the defendant is qualified or the better qualified person. In the court's statements immediately preceding its statement appointing the defendant, the court noted "that medical professionals involved with [Douglas'] current care and supervision have testified that it is the best interest[s] of [Douglas] to have the [defendant] appointed as [c]onservator."

When examining an ambiguous decision, however, "we presume that the trial court applied the correct standard . . . ." *Singhaviroj* v. *Board of Education*, 301 Conn. 1, 17 n.12, 17 A.3d 1013 (2011). We also "read the record to support, rather than to undermine, the judgment." (Internal quotation marks omitted.) *Blumenthal* v. *Kimber Mfg., Inc.*, 265 Conn. 1, 9, 826 A.2d 1088 (2003).

The record lends strong support to the statements in the decision that the Probate Court considered, and in fact relied on, the statutory factors. It is clear that the parties litigated the case under the expectation that the statutory factors would govern the court's decision. The defendant's attorney asked various witnesses questions relating to those factors. The attorney asked Yamini, for example, whether, in her opinion, the defendant had "any personal conflicts" with any of Douglas' physicians, whether he had "the ability to carry out the duties and responsibilities" of a conservator, and whether he had knowledge of Douglas' preferences. Although O'Hara used the term "best interest" on a few occasions during her testimony, including when expressing her belief that both parents had Douglas' "best interest" at heart, none of the questions posed to her sought to elicit an opinion in terms of Douglas' best interests. Indeed, the plaintiff did not object to the

relevancy of those questions posed or the responses given thereto. The plaintiff and the defendant also focused on the statutory factors in their closing arguments. The defendant's attorney, for example, stated "[l]et's discuss the statutory factors Your Honor needs to consider," and then went through the factors one by one. The plaintiff's attorney responded, arguing why the factors weighed in favor of appointing the plaintiff. Given this posture, we are not persuaded that the Probate Court either ignored this evidence and argument while stating in its decision that these factors were considered, or decided, without notice to the parties, that a factor other than the statutory factors would be given conclusive weight.

We acknowledge, however, that on the last day of the evidentiary hearings, the Probate Court stated that it had "to determine . . . what [was] in the best interest of" Douglas. In light of the Probate Court's decision and the litigation posture of the parties, however, it appears most likely that the Probate Court unwisely used the phrase "best interest" as shorthand for the collective effect of the statutory factors. Indeed, in its decision, the court stated that Douglas' current treatment providers had testified that it would be in Douglas' best interest to have the defendant appointed as conservator. Only O'Hara, however, had made a statement to that effect; the other providers directed their testimony to the statutory factors. Therefore, we conclude that, even assuming Douglas' "best interests" were considered, the plaintiff has failed to demonstrate that her substantial rights were prejudiced.

We underscore, however, that, had the record not been so clear that this case was litigated under the statutory factors, we would have been compelled to request an articulation or reverse the judgment. See, e.g., *Falvey* v. *Zurolo*, supra, 130 Conn. App. 255 (concluding that appointment of defendant as conservator was arbitrary and constituted abuse of discretion when Probate Court indicated that it had considered § 45a-650 [h] factors in appointing defendant but "the record [was] bereft of any evidence regarding the defendant or his qualifications to be conservator"). Moreover, although we recognize that there is no rule of practice or statute expressly requiring the Probate Court to make specific findings relating to the court's consideration of each of the statutory factors, it clearly would be the better practice to do so.

## II

We now turn to the plaintiff's claim that her substantial rights were prejudiced by the Probate Court's consideration of Margenot's report. Although Margenot's report was never offered or admitted as evidence, the plaintiff claims that the Probate Court improperly relied on it as though it had been, when the report could not have been properly received into evidence because: (1)

it contained a conclusion on the ultimate issue insofar as it recommended that the defendant be appointed; and (2) it was replete with hearsay. With respect to the first reason, the plaintiff argues that no one can be an expert qualified to testify on the ultimate issue of who should be appointed as a conservator because the § 45a-650 (h) factors "present questions of fact [that] do not require any special scientific or technical knowledge to decide."[10] Thus, according to the plaintiff, a recommendation on who should be appointed as conservator is not necessary to assist the court, and is therefore inadmissible under the rules of evidence. In the alternative, the plaintiff argues that, even if an expert's recommendation could help the court, a guardian ad litem may be an expert on the law, if also an attorney, but is not an expert on disabled adults. With respect to her second reason, the plaintiff claims that the hearsay throughout the report was harmful, pointing specifically to a statement attributed to O'Hara that the plaintiff's appointment as conservator would " 'kill' " Douglas. The defendant responds that there is no evidence that the Probate Court relied on the report, and, even if the court did rely on it, the report was cumulative of other admissible evidence and therefore harmless. We conclude that consideration of the report would have been improper under the circumstances. Nonetheless, we are not persuaded that the report, to the extent that it may have been considered, had a substantial impact on the Probate Court's decision.

One of the fundamental reasons that, prior to 2007, appeals from conservatorship proceedings were subject to trials de novo in the trial court was because Probate Court proceedings were relatively informal. See *Thomas* v. *Arafeh*, 174 Conn. 464, 470, 391 A.2d 133 (1978) (noting, inter alia, that strict rules of evidence were rarely followed). The trial court in the present case, however, was bound to follow the rules of evidence. See Conn. Code Evid. § 1-1 (b). Following the enactment of P.A. 07-116, in conservatorship proceedings under § 45a-650, the Probate Court is required to adhere to the more formalized procedures to which the trial court previously was bound. See General Statutes § 45a-650 (b). Thus, statements in a report by a guardian ad litem cannot be relied on as substantive evidence unless the report has been properly admitted into evidence.

A guardian ad litem's report is, by its nature, hearsay if offered for its truth, and it typically contains hearsay within hearsay insofar as it contains the out-of-court statements of others. See Conn. Code Evid. § 8-1 (defining hearsay). Use of such statements for substantive purposes (i.e., their truth) is barred unless they satisfy an exception provided by a statute or rule. See Conn. Code Evid. §§ 8-2 and 8-7. Such statements may be used, however, for nonsubstantive purposes under certain conditions. See, e.g., Conn. Code Evid. § 7-4 (b) ("The

facts in the particular case upon which an expert bases an opinion . . . need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. The facts relied on pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence."). An opinion on an ultimate issue of fact may likewise be inadmissible unless certain predicates are satisfied. See Conn. Code Evid. §§ 7-2, 7-3 and 7-4. In addition to these evidentiary constraints, relying on such a report for substantive purposes without requiring its author to be subject to cross-examination may raise due process concerns. See *Toms* v. *Toms*, 98 S.W.3d 140, 144–45 (Tenn. 2003).

During the proceedings in the present case, however, a Probate Court rule was in effect *requiring* a guardian ad litem to submit a written report to the court. Probate Court Rules (2012) § 4.3. Although that rule since has been repealed; see Probate Court Rules § 13.6 (effective July 1, 2013); a recent amendment to the conservatorship scheme appears to sanction or at least acknowledge the practice of guardians ad litem submitting reports to the court. See Public Acts 2012, No. 12-25, § 1, codified as General Statutes § 45a-132 (a) (3) ("[a]ny appointment of a guardian ad litem under this subdivision shall terminate upon the guardian ad litem's report to the judge or magistrate . . . or earlier upon the order of the judge or magistrate").[11] Nonetheless, the legislature has not set forth an exception to the evidentiary requirements for guardian ad litem reports. Cf. General Statutes § 54-46a (b) (in probable cause hearings, "[t]he court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving chain of custody shall be exempt from such rules"). It may be, however, that these reporting practices can be reconciled with the mandate that the rules of evidence apply to conservatorship proceedings.

Some courts have also drawn a distinction between reliance on such reports for substantive purposes and review for nonsubstantive purposes. See, e.g., *Toms* v. *Toms*, supra, 98 S.W.3d 144 ("[a]lthough a guardian ad litem's report is not admissible evidence, we hold that such a report may be reviewed by a trial court"); *Joyce S.* v. *Frank S.*, 6 Neb. App. 23, 33, 571 N.W.2d 801 (1997) (distinguishing between reviewing report to determine whether guardian ad litem has performed adequate investigation and relying on it for truth of statements therein). Indeed, the Tennessee Supreme Court noted that holding otherwise and precluding the submission of reports "would effectively undermine the important role played by a guardian ad litem" and that a guardian ad litem's report "may assist the parties by: [1] alerting the parties to the identity of potential witnesses who may be interviewed; [2] highlighting the testimony, both favorable and unfavorable, that may be presented at

trial; and [3] providing a third party's view of the facts of the case." *Toms* v. *Toms*, supra, 144.

In the present case, it is not clear to this court that the Probate Court relied on the report for substantive purposes rather than simply acknowledged that it had reviewed the report because it was required under then existing court rules to accept it. We first observe that every paragraph in the Probate Court's decision, except the one relating to the report, commenced with the phrase "This court finds" or "This court further finds . . . ." In contrast, the decision states: "Margenot, guardian ad litem, has filed his report . . . ." This appears to be a purposeful distinction. We further observe that the court never resolved on the record the plaintiff's specific evidentiary objections to the report or otherwise suggested why it had concluded that it could rely on the report in light of the statutory requirement of compliance with the rules of evidence that had been brought to the court's attention. With respect to any hearsay on which Margenot relied in reaching his recommendations, we agree with the trial court and the Appellate Court that there is no indication in the record that the Probate Court relied on any such hearsay for substantive purposes. With respect to Margenot's opinion as to the ultimate issue of fact, even if we assume that this opinion was substantively considered, we are not persuaded that any such impropriety prejudiced the plaintiff's substantial rights.

"When a court commits an evidentiary impropriety, we will reverse the trial court's judgment only if we conclude that the trial court's improper ruling harmed [a party]. . . . In a civil case, a party proves harm by showing that the improper evidentiary ruling likely affected the outcome of the proceeding." (Citation omitted.) *Weaver* v. *McKnight*, 313 Conn. 393, 417, 97 A.3d 920 (2014). "It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." *Swenson* v. *Sawoska*, 215 Conn. 148, 155, 575 A.2d 206 (1990). "In determining whether evidence is merely cumulative, we consider the nature of the evidence and whether any other evidence was admitted that was probative of the same issue as the evidence in controversy." *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 23, 60 A.3d 222 (2013).

The critical dispute before the Probate Court was which parent was committed to a course of treatment that would promote Douglas' welfare and independence. The defendant marshaled testimony from all of Douglas' current treatment providers in support of his application. Most significantly, O'Hara, who had treated Douglas for many years, had undertaken extensive testing and examinations of him, and who specialized in the very conditions at issue, opined that the defendant

was pursuing the proper and effective course of treatment. The plaintiff's own experts offered some support for the course of treatment undertaken by the defendant and only supported the possibility that Douglas could still have Lyme disease and that such a condition could be a contributing factor in his condition. Therefore, we cannot conclude that Margenot's opinion, which was consistent with the view of Douglas' longtime treating physician and the clear weight of the remaining evidence, likely affected the outcome.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] In her complaint appealing from the Probate Court's decision, the plaintiff named Peter DeNunzio and Douglas DeNunzio as defendants. For convenience, we refer to Peter DeNunzio as the defendant and to Douglas DeNunzio by his first name.

[2] Although § 45a-650 has been amended by the legislature since the events underlying the present case; see, e.g., Public Acts 2014, No. 14-103, § 6; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[3] The Appellate Court's opinion principally focused on a statement made in the Probate Court by Margenot at oral argument on the admissibility of his report regarding his opinion as to who should serve as conservator; *DeNunzio* v. *DeNunzio*, supra, 151 Conn. App. 410–11; but the Appellate Court noted that the same reasoning applies to his opinion in the report. Id., 412 n.6.

[4] The first question, as certified, stated: "Did the Appellate Court properly conclude that the trial court correctly used the 'best interest of the conservatee' standard as the basis for its decision?" *DeNunzio* v. *DeNunzio*, 314 Conn. 926, 101 A.3d 271 (2014). In accordance with established practice, we have reframed the question to more accurately reflect the issue presented to the Appellate Court. See *State* v. *Ouellette*, 295 Conn. 173, 184, 989 A.2d 1048 (2010).

[5] In *Gross* v. *Rell*, supra, 304 Conn. 269, this court recognized that, even under the pre-2007 scheme, the legal status of incapable adults was not equivalent to minors for all purposes. In that case, this court concluded that "the governing standard for the representation of impaired adult clients is not the protection of their best interests, but, to the extent possible, the zealous advocacy of their expressed preferences. This is true even if the Probate Court has appointed a conservator for the client." Id.; see id., 264, 270–71 (citing 2005 revision to General Statutes as applicable to case before court and overruling *Lesnewski* v. *Redvers*, supra, 276 Conn. 526, insofar as it held that conserved person may appeal in his or her own name from Probate Court decision only if conserved person's attorney demonstrates to trial court that appeal is in conserved person's best interests).

[6] Recently, in *Kortner* v. *Martise*, 312 Conn. 1, 52–53, 91 A.3d 412 (2014), this court quoted this best interests framework from *Lesnewski* v. *Redvers*, supra, 276 Conn. 540–41, under circumstances that did not require us to consider whether the "best interests" standard continued to apply to the selection of the conservator following the enactment of P.A. 07-116. Because *Kortner* was decided well after the Probate Court's decision in the present case, it could not have influenced that court's view of the proper legal standard. Nonetheless, it may have influenced the Appellate Court's view of the law, which we now clarify.

[7] Truax filed a brief in this court on behalf of Douglas arguing against the position advanced by the plaintiff in this certified appeal. The plaintiff contends that we should not consider Truax' brief because the fact that Douglas did not want to take a position before the Probate Court on which one of his parents should serve as his conservator makes it unethical for Truax to advocate for one parent over the other on appeal. Because Truax' brief does not raise any arguments that substantively differ from the defendant's, however, we need not consider the plaintiff's contention.

[8] We do not rely on Margenot's report in reaching that conclusion. See part II of this opinion.

[9] The fact that one statement in the decision refers to the "conservator(s) named above," rather than the "conservator" raises a question as to whether

this statement was preprinted on the Probate Court form. Nonetheless, the plaintiff has neither advanced such a contention, nor provided this court with a copy of the Probate Court form then in effect.

[10] It is unclear from the plaintiff's argument whether she recognizes that an expert may not only have scientific or technical knowledge, but also may have "other specialized knowledge" for which he or she is qualified as an expert by skill, experience, training, or education. See Conn. Code Evid. § 7-2.

[11] We recognize that there is an inherent tension between the guardian ad litem's traditional role as an advocate for the respondent's "best interests" and his or her role in proceedings determining whether a conservator is necessary and who should be appointed in light of the fact that the "best interests" standard no longer is applicable to such proceedings. The 2012 amendment to the conservatorship statutes, however, limited the circumstances under which a guardian ad litem may be appointed in conservatorship proceedings and required the order making such an appointment to specifically delineate the scope of the guardian ad litem's mandate. See General Statutes § 45a-132 (a) (3) ("No judge or magistrate may appoint a guardian ad litem for a conserved person in a proceeding under section 17a-543 or 17a-543a or sections 45a-644 to 45a-663, inclusive, unless [A] the judge or magistrate makes a specific finding of a need to appoint a guardian ad litem for a specific purpose or to answer specific questions to assist the judge or magistrate in making a determination, or [B] the conserved person's attorney is unable to ascertain the preferences of the person, including preferences previously expressed by the person. Prior to appointing a guardian ad litem for a person under subparagraph [B] of this subdivision, the judge or magistrate may question the person to determine the person's preferences or inability to express such preferences. If the judge or magistrate appoints a guardian ad litem under this subdivision, the judge's or magistrate's order shall [i] limit the appointment in scope and duration, and [ii] direct the guardian ad litem to take only the specific action required or to answer specific questions posed by the judge or magistrate . . . ."). Thus, the guardian ad litem's role may be limited, particularly when the issue to be decided is one in which the "best interests" standard no longer applies.

————————————————